## Emerson C. Whitney, Appellant, v. Helen G. Whitney, Appellee.

### Gen. No. 47,139.

First District, Third Division.
November 27, 1957.
Rehearing denied January 2, 1958.
Released for publication January 2, 1958.

425

William C. Wines, of Chicago, for appellant.

Sol R. Friedman & I. S. Friedman, and Thomas A. McCaffrey, of Chicago, for appellee.

JUDGE FRIEND delivered the opinion of the court.

This matter comes to us on a petition for leave to appeal within one year, as provided by statute, which was allowed. Plaintiff and defendant were married on February 15, 1936. One child, E. Bruce Whitney, now fourteen years old, was born of the union. On July 30, 1952 plaintiff filed his complaint for divorce against defendant, charging habitual drunkenness and adultery, and on December third of that year, the cause

having been heard as a default matter by agreement of the parties, a decree of divorce was entered in favor of plaintiff on the ground of habitual drunkenness. Prior to the entry of the decree the parties had entered into the following stipulation:

"WHEREAS, a suit for divorce has been filed by E. C. Whitney, hereinafter called Emerson, against Helen G. Whitney, hereafter called Helen, and Emerson wishing to make provisions to aid in the support of Helen in the event a divorce is granted, and for the purpose of compromising and settling other differences, it is therefore hereby mutually agreed by and between the parties hereto as follows:

"1. Emerson agrees to pay to Helen immediately upon the signing of the decree of divorce the sum of twenty-five hundred and no/100ths ($2,500) dollars, said sum to be evidenced by certificates of deposit and interest thereon heretofore made as U. S. Postal Savings Deposits in the name of Helen by Emerson.

"2. Emerson also agrees to pay to Helen in lieu of alimony, dower, maintenance and support, . . . and of all rights of every kind and character which have or may accrue to Helen an additional sum in the amount of twelve thousand ($12,000) in equal monthly installments of one hundred ($100) dollars each upon the first day of each and every month for ten years, starting on the first day of the first month following the signing of the decree in the above entitled cause of action. In the event Helen remarries, then the amount to be paid to her under the terms of this paragraph shall decrease to one-half of the remainder then due and owing and the monthly payments thereafter shall similarly be reduced to one-half of the above amount. Said obligation and payments shall cease in the event either party to this agreement dies."

In consideration of the foregoing provisions each party released the other from all claims, interest in property, etc.

By the decree entered, the custody of the son was awarded to and has since remained with the plaintiff. The decree further provided "that plaintiff pay to the defendant the sum of $14,500 in full of all alimony, past, present and future, or any other rights defendant may have by virtue of the marriage relationship, said amount payable $2,500 upon signing of decree, and the balance of $12,000 at the rate of $100 per month until fully paid."

It should be noted that the decree did not contain the provisions of the stipulation that upon defendant's remarriage her gross award should decrease to one-half of the remainder then due and the monthly payments thereafter due should be similarly reduced to one-half or $50 per month, that on the death of either party payments and obligations should cease, nor that the $2,500 to be paid to defendant was "to be evidenced by certificates of deposit and interest thereon heretofore made as U. S. Postal Savings Deposits in the name of Helen by Emerson."

Subsequently, in March 1955, defendant remarried, and upon learning of her remarriage plaintiff, relying on the stipulation, reduced his payments, which had theretofore been regularly paid for approximately two and one-half years in the amount of $100 per month, to one-half that sum, or $50 per month.

On June 20, 1955, defendant filed her petition for a rule to show cause why plaintiff should not be held in contempt for failure to pay alimony in accordance with the original decree. She admitted under oath that he had complied strictly with the provisions of the decree up to the time of her remarriage, and also that additional payments totaling $125 had been paid after the remarriage. In reply to defendant's petition plaintiff filed his answer and counterpetition for relief from payments of alimony; in it he admitted the decree for divorce in his favor, averred that there had been a

stipulation, relative to support money, signed by the parties and witnessed by defendant's father and sister, which had been exhibited to the trial court (Judge Roberts) and made an exhibit in the report of proceedings at the trial on November 6, 1952; he further averred that in its decree the trial court passed over the stipulation and in its place provided that defendant be awarded the sum of $14,500 "in full of all alimony past, present, and future"; that defendant had remarried in March of 1955 and was then being supported and maintained by her second husband; and that the only change of circumstances since the decree had been the remarriage of both the parties.

Thomas A. McCaffrey then represented defendant; he had been retained to enforce her alleged claim of right to $100 a month and took the position that even if the stipulation, which was missing from the court files, along with the record of proceedings and other documents, should be produced, it could not be read to contradict the decree. He argued that the decree, which was silent as to defendant's rights in the event of remarriage, should be construed to entitle her to the full sum of $100 per month, notwithstanding her remarriage and notwithstanding the stipulation provision for reduction to one-half that sum.

At this state of the proceeding Friedman and Friedman entered the case as co-attorneys. It was about this time that defendant produced the missing stipulation. The only pleadings then before the court were the petition for a rule and the counterpetition for relief from further payments because of defendant's remarriage. No charge of fraud had been made by the defendant. Nevertheless, Friedman called plaintiff as a witness for cross-examination under section 60 of the Practice Act (Ill. Rev. Stat. 1955, ch. 110), and the court permitted him to adduce evidence as to plaintiff's finances and those of his mother (who was not a party

to the suit) at the time of the divorce, and also their subsequent financial means. There was nothing in the pleadings as they then stood to warrant such procedure; the only questions before the court were (1) whether plaintiff was in default by reason of his failure to pay defendant $100 per month pursuant to the decree for divorce—and this depended upon whether the decree or the stipulation was controlling; and (2) if the decree was held to be controlling, an interpretation of it to determine whether its provisions for the payment of $14,500 constituted a settlement in gross or alimony. There had been no request by defendant in the pleadings or otherwise for the acceleration of the unpaid balance due under the decree. Notwithstanding these circumstances, the court then permitted the parties to file a plethora of supplemental pleadings, affidavits and motions, too numerous and too lengthy to set out here in detail, and to adduce evidence thereunder, which extended the trial another five days, on extraneous issues which had nothing whatever to do with the controversy presented by the pleadings. In substance defendant's supplemental pleadings alleged threats and promises calculated to induce her to enter into the property settlement in an amount that was smaller than reasonable because, as she alleged, plaintiff concealed from her the fact that he was worth about a million dollars, and that the procurement of the settlement was therefore a fraud. Undoubtedly defendant knew that these charges were without merit, and if her present counsel had familiarized themselves with the circumstances leading up to the original decree for divorce, they too would have been aware.that the charges of fraud and duress had no validity. The stipulation between the parties was part of the report of proceedings when Judge Roberts entered the decree. At first defendant denied that she had signed it. However, the record shows that she signed it twice, once

430

in the presence of her father and her sister. In the latter part of November 1952 defendant, in discharging her first Chicago attorney (he had been preceded by a Florida attorney), stated in a letter sent to him that "I am perfectly satisfied with the settlement, which I negotiated entirely by myself after you refused to come to the evening meeting at my folk's home in order to assist me with the details." It is further disclosed by the record that during their married life defendant, who had been a legal stenographer before her marriage, had regularly assisted plaintiff in preparing his income tax returns and had also helped him prepare some of his mother's returns, indicating that she must have been thoroughly familiar with his finances and could not have been induced to sign the stipulation because plaintiff withheld from her the fact that he was worth about a million dollars. Moreover, she availed herself of the benefits of the decree by accepting from plaintiff, over a period of two and one-half years, monthly payments of $100 without any protest. It is significant that after hearings extending over six days, the court in its order of March 23, 1956, from which this appeal is taken, made no findings whatever as to the charges of fraud predicated upon threats, promises and duress, as set out in defendant's pleadings, but merely decided that the original decree was in full force and effect, and that it should not be modified or revised in any particular except that plaintiff pay defendant the sum of $11,675 within five days, allowed defendant fees for her attorneys Sol. R. Friedman, I. S. Friedman and Thomas A. McCaffrey in the sum of $1,000 and entered a rule against plaintiff to show cause why he should not be held in contempt of court for failure to comply with the original decree.

■■ The first question presented is whether the provisions of the decree or the stipulation should prevail. Plaintiff had assumed that the decree incorpo-

431

rated the provisions of the stipulation; he had not seen a draft form of the decree before its entry because of his absence from the city, and it was not until after defendant had filed her petition for a rule to show cause that he learned that the decree required him to "pay to the defendant the sum of $14,500 in full of all alimony, past, present and future, or any other rights defendant may have by virtue of the marriage relationship." The decree makes no mention of the stipulation' or any of its qualifying provisions. Accordingly we hold that the decree must be controlling, regardless of any stipulation.

The second question presented is whether the provisions of the decree with respect to payment are to be construed as settlement in gross, to be paid in installments over ten years, or as alimony. This question has frequently been considered by courts in this State. Extensive citation and discussion of these decisions will serve no useful purpose since the law now seems to be well settled. In Walters v. Walters, 409 Ill. 298, which is a recent expression of our Supreme Court on the problem, the court pertinently observes that "this situation [the question whether remarriage stops the payment of alimony] cannot arise as to decrees modified subsequent to 1949 when the last amendment to section 18 went into effect. (Ill. Rev. Stat. 1949, chap. 40, par. 19.)" That amendment provides that "a party shall not be entitled to alimony and maintenance after remarriage; but, regardless of remarriage by such party or death of either party, such party shall be entitled to receive the unpaid instalments of any settlement in lieu of alimony ordered to be paid or conveyed in the decree." "By that amendment," said the court, "all such settlements payable in installments and made in lieu of alimony are to be received regardless of the remarriage of either party to the suit." Later in the opinion the court said: "We think the rule in this

432

State is that in cases prior to the amendment of 1949, where it clearly appears the order is for support and sustenance of the spouse and the provision therefor is plainly separable and segregable from the property provisions of the contract or decree upon which it is based, the total award, when it is so payable in installments, is modifiable at any time, upon a proper showing. In other words, if it is in fact an allowance for alimony, then it is modifiable as such, and therefore, before the amendment, remarriage would bar future payments." To revert to the original provisions in the decree in this case, it provided, as heretofore stated, that plaintiff pay to the defendant "the sum of $14,500 in full of all alimony, past, present and future, . . . at the rate of $100 per month until fully paid." As stated in Walters v. Walters, "decrees in matrimonial cases refer to 'alimony in gross' or 'gross alimony.' Most generally these terms are applied to an amount agreed upon or determined in full or in lieu of all alimony and the amount is frequently payable in installments. Most of the confusion in those cases has resulted from a loose application of these terms and the intention of the parties has not been clearly established by the order or decree." It seems clear to us that the terms of the decree in the instant proceeding awarded defendant the gross sum of $14,500 "in full of [or, as we construe it to mean, in lieu of] all alimony, past, present and future, . . . at the rate of $100 per month until fully paid." Although phrased in different language, this is analogous to the provision in the Walters case referred to as a " 'lump sum property settlement and alimony in gross.' " There the court stated: "If we are to accept defendant's version we must hold it to be exclusively for periodic payments of alimony only. This we cannot do, for it would do violence to the very terms of the agreement itself." In the light of these conclusions and under the provisions of the amendment to the Divorce

433

Act plaintiff is required to continue the monthly payments of $100 until the total sum has been paid in full.

The trial court made no specific findings in the order entered March 23, 1956 but accelerated the unpaid balance and directed plaintiff to pay defendant the sum of $11,675 within five days from the entry of the order, that sum being "due after allowance of said credits [monthly payments made over some eighteen months] to the plaintiff." Defendant admitted in her sworn pleadings and testimony that plaintiff had paid her the sum of $5,325 under the decree during a period of two and one-half years since the date of its entry, thus entitling her to the further payment of $9,175 at $100 per month; instead, plaintiff was ordered to pay $11,675 within five days, an increase of $2,500. This latter sum represents the down payment of $2,500 made by plaintiff upon signing of the decree. The court evidently proceeded upon the theory that the amount represented by certificates of United States Postal Savings deposits belonged to defendant, but she admitted that plaintiff had paid for these postal savings certificates and that the deposits had been made in the bank in her name because plaintiff's own postal savings account had been deposited to the maximum of $2,500 allowed by the government. Although the decree is controlling, defendant's admission in the stipulation that the sum of $2,500 was to be "evidenced by certificates of deposit and interest thereon heretofore made as U. S. Postal Saving Deposits in the name of Helen by Emerson" is binding upon her.

A further question to be decided is whether the court was justified in accelerating the entire balance due under the original decree. Defendant relies on section 19 of the Divorce Act which provides that "in any order entered pursuant to this section, the court may order the defendant to give reasonable security for such alimony and maintenance or such money or

434

property settlement, or may enforce the payment of such alimony and maintenance or such money or property settlement in any other manner consistent with the rules and practices of the court, where a party *wilfully* refuses to comply with the court's order to pay alimony and maintenance or to perform such money or property settlement, or has shown himself unworthy of trust." (Italics ours.) In reliance on this provision, the trial court ordered that plaintiff make the full payment within five days, and directed plaintiff to show cause why he should not be held in contempt for failure to comply with the rule. Plaintiff had not wilfully withheld $50 a month under the original decree; he proceeded upon the theory that the stipulation was binding. It is conceded that he made all payments up to the time of defendant's remarriage, and in fact he paid $125 in addition after her remarriage. It would be a gross miscarriage of justice to hold that plaintiff was contemptuous or that he wilfully refused to comply with the court's order. Nor are there any circumstances of record that would justify the court in holding that he had "shown himself unworthy of trust"; rather, he had proved himself exemplary in the matter of making his monthly payments. We hold that the acceleration of the balance due is not justified.

■ Finally, we are called upon to determine the reasonableness of the $1,000 fee allowed defendant's counsel. This sum is based upon time spent in preparation of the petition for a rule and its presentation and hearing, as well as the daily attendance in court for six days on the trial that ensued. As already indicated, the questions presented to the court by the original petition for a rule and plaintiff's counterpetition were relatively simple, and the litigation should have been decided upon those pleadings. The charges of fraud and duress contained in the supplemental pleadings were untenable in the light of defendant's admission that

she had negotiated the settlement herself, that it was signed in the presence of her father and sister, and that she had assisted plaintiff over the years in preparing his income tax returns, as well as some of his mother's. The numerous extraneous pleadings allowed to be filed and the voluminous testimony adduced thereunder injected issues into the case outside the scope of the pertinent pleadings and extended the hearing for approximately five trial days. The trial judge who originally heard the case undoubtedly had jurisdiction, and it was obvious that the claimed fraud and duress did not serve to confer jurisdiction after two and one-half years unless they were of a nature that would have precluded the court in the first instance from taking jurisdiction. Moreover, it was apparent at the outset that defendant had received payments regularly under the decree for approximately two and one-half years, had availed herself of its benefits, and had made no offer to return any of the money so received. Despite the fact that she had had three different attorneys before she retained the Friedmans, she had never, since the entry of the decree, made any complaint. After a careful examination of the record and the issues here presented, we are satisfied that this litigation could and should have been terminated within the course of a day, and that the reasonable value of fees for defendant's counsel should not exceed $500.

It is with reluctance that we call attention to the conduct of Sol R. Friedman, one of defendant's counsel. In the heat of trial attorneys may sometimes fail to observe the proprieties; but here counsel's conduct was so consistently flagrant that we cannot refrain from commenting on it. Not only did he extend his questioning—and his remarks—into areas not pertinent to the issues, and file pleadings making charges which he should have known were not sustainable and could

have the purpose only of producing passion and generally muddying the waters, but he subjected plaintiff, a fellow attorney acting pro se, to insulting and harassing pressures all through the hearing. "I want to show," Mr. Friedman said, "the chicken feed deal he gave to his wife. . . . he gets a cheap deal for himself . . . after I finish he deserves to go to jail, this wealthy man . . . He belongs in jail . . . I want to prove what he was." This was his line of attack, despite the fact that the original charges in plaintiff's complaint were habitual drunkenness and adultery, and notwithstanding the fact that the decree for divorce was granted to plaintiff on the ground of habitual drunkenness. A few hearings and some two months later (the hearings had been continued from time to time) Mr. Friedman was saying of plaintiff: "I am showing you are a charlatan." The next day Mr. Friedman was charging: "You haven't given her any money for child support [this despite the fact that plaintiff and not defendant had custody of the child, according to the provisions of the decree]. Your reputation is all over the country. The Republican Party threw you out because you were crooked." It was at this point that the trial judge made his presence known by inquiring: "Would you gentlemen like to step out into the hall?" —a succinct but compelling indication that he had lost control of the trial and had abandoned his judicial function. Later this same day Mr. Friedman was making charges of adultery on the part of plaintiff: "I want to show he not only had an affair with a woman but had an illegitimate child." He came back to this theme later in the day: "If I proved adultery on the part of Mr. Whitney—which I can—illegitimate child." In retaliation for plaintiff's examination of his son with reference to whom he preferred to live with—the child had said that defendant had been drunk the previous fall and would "start a fight over anything"

437

—Mr. Friedman said: "If Mr. Emerson Whitney is permitted to go at length with this examination with his son, I am going to ask the Court for leave to bring in a lady who contends that Mr. Whitney is even now under a court action by this girl for breach of promise to marry her, and I can show he carried on a love affair . . . this woman . . . is suing him, and there is a lawsuit still pending." Plaintiff made an emphatic denial of these charges, saying: "Every word is false, including the fact there is an action pending against me, I would like also to say that counsel has picked an article out of the newspaper and on several occasions shown it around the court room and to the Judge, away from the court reporters to try to, I assume, poison the Judge's mind, and he also has shown it yesterday for two reporters from newspapers and a photographer, he brought him also in to get publicity at the same time. . . . The photographer took a picture of myself, and I was bending over my paper at the desk, and the Judge was approaching the bench. Now, counsel has done this repeatedly since the beginning of the trial and done it merely for the purpose of instilling poison and extraneous issues." Mr. Friedman countered that he hadn't "found any person that has a good word to say for you even among Republicans." In the course of the hearing Mr. Friedman asked a witness the wholly irrelevant question: "Do you know that she [Mr. Whitney's mother] was working in burlesque?" Plaintiff objected and characterized the question as "the rottenest; that is the height of it, your Honor." When plaintiff's veracity was questioned, he offered to take a lie detector test and also pay for one for defendant and her counsel; whereupon defendant said: "This man would pass easily a lie detector test because he has no conscience whatsoever." Diatribes and bickerings of this kind marked the trial throughout. We cite the foregoing instances to show how far defendant's counsel

was permitted to depart, not only from the relevant issues, but from recognized legal ethics and common decencies incident to a trial. The trial judge stated that he disregarded the remarks; instead he should never have permitted them—he should have held counsel to an orderly examination. As pertinent to these observations, we quote from "A Code of Trial Conduct," promulgated by the College of Trial Lawyers and appearing in the March 1957 issue of the American Bar Association Journal (vol. 43, p. 223): "9. RELATIONS WITH OPPOSING COUNSEL. . . . (b) A lawyer should avoid indulgence in disparaging personal remarks or acrimony toward opposing counsel, and should remain wholly uninfluenced by any ill feeling between the respective clients. He should abstain from any allusion to personal peculiarities and idiosyncrasies of opposing counsel . . . (d) A lawyer should never be unfair or abusive or inconsiderate to adverse witnesses or opposing litigants, or ask any question intended only to insult or degrade the witness. He should never yield, in these matters, to suggestions or demands of his client or allow any malevolence or prejudice of the client to influence his actions." This court too has had recent occasion to comment on trial conduct. In Eizerman v. Behn, 9 Ill.App.2d 263, it was said: "A trial properly conducted is a dignified procedure. Counsel in the case are officers of the court and owe a duty to the court, to opposing counsel, to the cause of justice and to themselves. Often in the heat and fervor of a sharply contested trial these standards are forgotten. Too often they are not only forgotten but completely disregarded and dragged in the mire." It should be added that the conduct of the case is within the control of the trial judge; it is he who primarily has the power and the duty to preserve decorum.

For the reasons indicated, the judgment of the Circuit Court is reversed, and the cause is remanded with directions to vacate the order of March 23, 1956 appealed from, and to enter an order requiring plaintiff to pay defendant the arrearages that are due and to resume paying her $100 a month in accordance with the provisions of the decree; crediting plaintiff with the $2,500 paid on account of the gross settlement at the time the decree was entered; and requiring him to pay defendant $500 as fees for her counsel participating in the services necessitated by the institution of the instant proceeding.

Judgment reversed and cause remanded with directions.

BURKE, P. J. and BRYANT, J., concur.