[Civ. No. 32265.   Second Dist., Div. Four.   Dec. 31, 1968.]

WILLARD W. SHEPHERD et al., Plaintiffs and Appellants, v. DeVILLE ENGINEERING CONSTRUCTION COMPANY, Defendant and Respondent.

Walker, Wright, Tyler & Ward and W. R. Drayton, Jr., for Plaintiffs and Appellants.

David L. Jacobsohn for Defendant and Respondent.

COLLINS, J. pro tem.*—This action was commenced as one to foreclose a chattel mortgage on a Caterpillar Tractor which defendants had hypothecated to plaintiffs as security for the payment of all rentals and other obligations under a Machinery Lease Agreement covering three units of earth-moving equipment. However, by the time the litigation reached the trial stage, the action, without any amended or supplemental pleadings being filed in the interim, became one to collect a

---

*Assigned by the Chairman of the Judicial Council.

balance allegedly due as unpaid rental and for liquidated damage as provided in a formula set out in the agreement.[1]

Plaintiffs (appellants) are Shepherd Machinery Co., a copartnership, and three members of the Shepherd family who are the partners. They distribute, sell and lease earth-moving equipment, among other types of machinery. Defendants (respondents), so far as this appeal is concerned, are DeVille Engineering Construction Co., a copartnership, and its members, Hector Dominguez and John A. Kavanagh.

Early in August 1964 defendants made an oral arrangement with the Janss Corporation to perform extensive grading and earth-moving work on a contemplated residential development by Janss known as the Las Posas Hills Project in Ventura County.

The project required the use of three Caterpillar Tractor-Scraper units (Model 641) which were not available from defendants' normal sources of rental equipment. Later in August 1964 defendants arranged to lease from plaintiffs three ''641'' units, after receiving assurance that they could be delivered by September 15, 1964. The Machinery Lease Agreement, a formal printed document prepared by plaintiffs, was signed by the parties on August 23, 1964. It specified that the lease terms would commence on September 17, 1964; but later, when it developed that there would be a delay in shipping the three units from the Caterpillar factory in Peoria, Illinois, a new formal agreement was signed by the parties on September 18, 1964. This latter agreement is the one on which plaintiffs base their claim for accrued rental payments and liquidated damages.[2]

---

[1] The Caterpillar Tractor which was the subject of the chattel mortgage, was also the subject of a prior conditional sales contract between the parties. After commencement of the action on March 11, 1965, plaintiffs elected to declare defendants in default under the conditional sales contract and to repossess and sell the tractor at a non-judicial sale and to apply the excess of the proceeds over the debt to the alleged rental due under the Machinery Lease Agreement with the result that the matter of a judicial foreclosure of said tractor became moot.

[2] The Machinery Lease Agreement does not specify a date for delivery of the equipment except as may be implied in the language ''The term of this Agreement shall commence on the 5th day of October 1964 . . .'' and shall continue for a minimum term of six months at a rental rate of $13,500 a month (plus the applicable California Use Tax). The agreement includes other provisions which are not relevant here, including a provision for liquidated damages in case plaintiffs should elect to terminate the agreement by reason of default on the part of the customer (i.e., defendants as lessees of the equipment). In passing we note misgivings as to the applicability of the liquidated damages provision to the facts here presented.

In order to qualify for plaintiffs' requirements for credit, defendants executed a "Mortgage of Chattels," so-called, covering a Caterpillar Tractor which defendants had acquired from plaintiffs pursuant to a conditional sales contract dated March 7, 1963 (and which plaintiffs caused to be sold at a nonjudicial sale as already noted).

The evidence, as reflected in one of the trial court's findings, is that, at some time prior to October 5, 1964, the parties were in agreement that plaintiffs were under no duty to make delivery until such time after October 5, 1964, as defendants should request plaintiffs to do so. No such request was ever made.[3] Instead it developed that defendants' starting time on the Janss Corporation's project was postponed from time to time after September 15, 1964, and finally in mid-November Janss notified defendants that due to revised financing plans and other changes, the earth-moving and grading work would be awarded on bid to the low bidder. The record shows that between September and November, defendants sought to persuade Janss not to submit the work "to bid"; that in late October 1964 they represented to Janss that they were "on the hook" to plaintiffs for approximately $25,000 because of a rental agreement covering the equipment. Thereafter, on December 8, 1964, pursuant to an invitation, defendants submitted a bid for the contemplated work, but they were not awarded a contract.

In the meantime, plaintiffs shortly prior to the scheduled monthly rental payment dates of November 5 and December 5, respectively, (as well as the later date of January 5, 1965) mailed to defendants monthly invoices for $14,040 each.

In the meantime, namely, on November 13, 1964, defendants received in the mail from plaintiffs two tissue copies of a manifold printed form designated "CREDIT" (hereinafter referred to as the Credit Memo). That document, under the caption "Description" recites: "Cancel Lease No. 6423 in its entirety. Machines never delivered," and under the caption "Machinery description,"—the serial numbers of three model 641 Tractor-scraper units is entered.[4]

---

[3]The date after October 5 that the equipment was available for delivery apparently was October 6, 1964, or thereabouts.

[4]Under imprinted boxed captions on the document additional data is entered, including "Date Returned: 10/5/64"; "Date Credit Issued: 11/13/64; No. Copies: Tissues." On the face of the document is typed the name "Deaderick." The evidence shows that at the time Moreland

On December 22, 1964, representatives of the parties met to discuss settlement of their differences. Defendants, at that time, advised plaintiffs that they would not accept or pay rent on the equipment, contending that their arrangements with Janss had been seriously jeopardized by reason of plaintiffs' earlier failure to deliver. Defendants testified that the Credit Memo was discussed at the December 22d meeting, while plaintiffs' witnesses categorically deny that any reference was made to the memo at any time prior to or on January 5, 1965, when plaintiffs elected to cancel the Machinery Lease Agreement, allegedly in accordance with their rights thereunder. Plaintiffs' representatives at the December 22, 1964 meeting were John Pilon, general sales manager, and Deaderick, the salesman. Both testified that at that time the defendants did not mention a credit memo or a cancellation memo and did not display any such document; that when they later reported on the meeting to Mr. Tom Shepherd, they did not mention any memo because none was discussed. Mr. Pilon testified that he first learned of the existence of the memo some time in January 1965, when Mr. Shepherd told him of its existence,[5] stating that unfortunately an internal credit memo had been issued on the DeVille lease.

Mr. Victor explained that invoices and credit memos are utilized as a matter of procedure for billing the customer "and also for certain internal purposes." He stated that "credit memos are used to give the customer credit, obviously, and in that case there are additional copies, at least one of which is pink in color is mailed to the customer." He testified further that when a lease of equipment is involved, a copy of the lease is furnished the accounting department, and in this manner the inventory accountant is informed that "the machines are now going into the field, they remain in our inventory because they are property, [sic] but this identifies them as out in the field;" that in the instant situation the

(Moe) Deaderick, Jr., was a tractor salesman in the employ of plaintiffs, that he served under the general sales manager, John Pilon, but he did not participate in the preparation of the document.

[5] Plaintiffs' controller, Mr. Paul H. Victor, testified that he first heard of the credit memo sometime in February 1965; that after he had instructed plaintiffs' attorney to prepare a complaint in the present action, he was informed that the attorney had learned from defendants' attorney that a credit memo was in existence; that then he received a memo from Mr. Tom Shepherd inquiring how this could have happened; that he then caused an investigation to be made as to the circumstances and reasons attending its issuance.

delivery report, normally issued when a machine is given the customer, had not been received from the credit department, and upon questioning the coordinator in the sales department as to the reason, he learned that the machine had not been delivered by Novemebr 13, even though more than a month had run under the lease agreement; that "in order to notify the accounting department internally that the machines were not in the field in accordance with what the lease would indicate and the IBM Department to suspend their records, we issue an internal credit memo"; that to insure that the memo will be treated "only as internal and not in the normal, not to be used in the normal sense of a credit memo whereby a customer would get a copy, where it says on the credit memo 'Number of Copies' we type in the word 'Tissue'; and that the purpose of this entry is to inform the accounting department that no customer copies are to be mailed."

Referring to entries on the credit memo form, Mr. Victor testified that opposite the words "Cancel Lease No. 6423 in its entirety, machines never delivered" there appears in the "extension" column "only the figures 0.00, no dollars and no cents, so that the credit memo has no value, monetary value, and we are telling on the credit memo to the accounting department to cancel lease No. 6423 in its entirety, the machines never delivered and in normal cases, because this happens more often than in a particular case [sic], we have had a situation like this before and since, where machines are not delivered on the originally indicated delivery date, when the machines then are finally delivered, we may issue at our option an amendment by agreement with the customer to commence the payment dates and the lease dates at a later date than originally shown in the lease, and then we start from scratch." He continued by stating that if the procedure was not observed "the rental income represented on the rental invoices would be taken into income ahead of its receipt, and our procedure is we do not normally do this until the money is received."

Mr. Victor also testified that the rubber-stamp word "Void" on the memo was further evidence of the intention to use the memo for internal purposes only, and not for billing. It is processed through the IBM Department to account for the number. The legend "Void" is used "to tell us later that this credit memo was used for one purpose or another, and it is not missing, hasn't disappeared. Otherwise, we would not

know what has happened to it." Mr. Victor also testified that the name "Deaderick" was typed on the face of the memo because Deaderick was the salesman who dealt with defendants for the lease of the equipment. When questioned by the court as to how and by whom the credit memo happened to be mailed to defendants, the witness testified as follows: "I haven't got the foggiest notion." He added that when the typist inserts the word "tissue" in the "No. copies" column of the form "that tells her to pull the pink color and toss it."[6]

The complaint in the action was filed on March 11, 1965. It makes no reference to the Credit Memo, although plaintiffs' responsible officials, as already indicated, knew in January or February 1965 of its issuance and receipt by defendants. Defendants' answer to the complaint filed on March 30, 1965, pleads as an affirmative defense the delivery of the Credit Memo and attaches a photocopy of the memo as an exhibit thereto. At the same time defendants (as cross-complainants) filed a cross-complaint against plaintiffs (as cross-defendants) charging breach of contract based on an alleged failure to deliver the leased equipment on the agreed delivery date with the direct result that defendants lost a Janss Corporation contract to their alleged damage in the sum of $158,800. The second cause of action of the cross-complaint alleges that the Chattel Mortgage on the Caterpillar Tractor, which defendants executed as security for their performance of the Machinery Lease Agreement should be rescinded and the hypothecated equipment reconveyed to them.

The answer to the cross-complaint denies that plaintiffs breached the Machinery Lease Agreement, denies that defendants had a contract with the Janss Corporation, and denies that defendants sustained any damage as a result of any conduct on plaintiffs' part.[7]

---

[6]The record shows that four manifold specimens of a memo are prepared in the credit department; all four, bearing the imprinted number "32536" and identical text were received in evidence. Plaintiffs' exhibit 13, the typed original, is on white paper and bears the rubber-stamp imprint "Void." The white original alone bears the handwritten endorsement "Memo only." Plaintiffs' exhibit 15 is on green paper, and it is retained in the customer's file in the credit department. Defendants' exhibits D and I are both on pink paper and do not bear the "Void" stamp or the endorsement. The latter two were mailed to defendants, the white and green specimens were produced from the records of plaintiffs.

[7]The court's findings, conclusions and judgment favored the plaintiffs (cross-defendants) on all issues tendered by the cross-complaint. Defendants have not pursued an appeal from that determination, so we are not further concerned here with the cross-action.

On the issues tendered in the main action the court found that the parties entered into a Machinery Lease Agreement dated September 18, 1964, that as modified this agreement did not obligate plaintiffs to deliver the earth-moving units until such time after October 5, 1964, as defendants should request, and that defendants never did request delivery; that plaintiffs had fully performed their obligation under the agreement when defendants on December 22, 1964, advised plaintiffs that they would not take delivery of the equipment, would not pay any rental therefor or damages for breach of the lease agreement.

The court further found that on November 13, 1964, plaintiffs prepared the Credit Memo and sent two copies thereof by mail to defendants; that plaintiffs sent defendants three successive invoices for monthly rental dated November 5 and December 5, 1964, and January 5, 1965, respectively, each in the amount of $14,040; that on January 5, 1965, plaintiffs purported to terminate the Machinery Lease Agreement in accordance with its terms, and thereafter incurred expense in making the subject units of equipment ready for sale and selling same, and that plaintiffs' actual loss in this connection was the sum of $49,110.82.

The court also found that defendants did not owe plaintiffs either that amount, nor the sum of $13,500 or any other sum claimed as liquidated damages, nor any transportation expenses as claimed, but did find that defendants were obligated to plaintiffs for attorney fees (computed at $754.58) incurred with respect to the steps taken to foreclose the chattel mortgage pleaded in the complaint and in accordance with its provisions. The court's finding which purports to determine the crucial issue of liability, is as follows: "The Plaintiffs released the Defendants, and each of them, from their lease agreement dated September 18, 1964 by the delivery of the Credit Memo Ex I attached to answer." (Finding XXVIII.)[8]

In its Conclusions of Law the court stated that plaintiffs' act in repossessing the hypothecated Caterpillar Tractor was a valid exercise of their rights under the conditional sales contract covering this item, and that pursuant to a sale thereof, plaintiffs hold for defendants' benefit the sum of $16,042.48

---

[8]Technically, this is a conclusion of law, rather than a finding of fact. If that were its only defect, we could treat it as a conclusion, but still it does not respond to plaintiffs' request for specificity.

less an offset for attorneys' fees ($754.58) or a net sum of $15,287.90, for which sum, plus interest, judgment was rendered in defendants' favor.

■ Both before and after the signing of the findings, plaintiffs made written requests for specific findings on several issues as provided in Code of Civil Procedure, section 634.

These requests sought specific findings with respect to plaintiffs' intentions in issuing the Credit Memo, whether it was issued merely in pursuance of plaintiffs' internal accounting procedures, whether copies of the memo were sent to defendants intentionally or as a result of mistake, and if the latter, whether there was a unilateral mistake on plaintiffs' part of which defendants had knowledge,[9] whether defendants placed any reliance thereon at any time prior to plaintiffs' purported termination of the lease agreement on January 5, 1965, whether plaintiffs are estopped to rely on the claim of mistake in sending the Credit Memo, and whether defendants changed their position or otherwise suffered any detriment as a result of the Credit Memo being sent to them.

■ It is not every failure on the part of the trial court to heed requests for special findings that requires reversal even though the Code of Civil Procedure (as amended in 1959) provides in section 632 that the statement of the facts found "shall fairly disclose the court's determination of all issues of fact in the case," and provides in section 634, that an appellate court "shall not infer that the trial court found in favor of the prevailing party" on any material issue of fact respecting which a specific finding was requested and not granted.

It has been held that the amendments to sections 632 and 634 did not change the basic rule as to form and content of findings, namely that only the ultimate facts need be found. (See *Wisler* v. *Wisler,* 198 Cal.App.2d 511, 514 [17 Cal.Rptr. 813]); and it is also a well established rule that the court is not required to make findings upon mere evidentiary facts which would add nothing of value. (*Lewetzow* v. *Sapiro,* 188 Cal.App.2d 841, 845 [11 Cal.Rptr. 126].) Section 634 "does not require that a finding be made as to every minute matter

---

[9]While a unilateral mistake without other factors is generally not a ground for relief (see Civ. Code, § 3399), an exception is recognized when the mistake is one which the other party at the time knew or suspected. (*Wilson* v. *Moriarty,* 88 Cal. 207, 212 [26 P. 85]; *Baines* v. *Zuieback,* 84 Cal.App.2d 483 [191 P.2d 67].)

on which evidence is received at the trial. . . ." (*Coleman Engineering Co.* v. *North American Aviation, Inc.*, 65 Cal.2d 396, 410 [55 Cal.Rptr. 1, 420 P.2d 713].)

As explained in *Garber* v. *City of Los Angeles*, 226 Cal. App.2d 349, at p. 355 [38 Cal.Rptr. 157], the purpose of the 1959 amendments was "to discourage the mere finding of so-called ultimate facts when such method left counsel and the appellate court unable to determine the trial court's resolution of the conflicting facts needed for a factual determination of the case."

In this case the issues of intention and mistake as they relate to the Credit Memo, and defendants' reliance thereon are all matters relevant to the ultimate adjudication that the plaintiffs "released" the defendants.

Under the circumstances of this case plaintiffs were entitled to specific findings as requested.[10] The trial court's failure to comply with the requests leaves us "unable to determine the trial court's resolution of the conflicting facts needed for a factual determination of the case." (See *29 Palms Van & Storage* v. *Los Angeles Metropolitan Transit Authority*, 221 Cal.App.2d 183, 186 [34 Cal.Rptr. 430] ; and *Mecchi* v. *Picchi*, 245 Cal.App.2d 470, 480, 481 [54 Cal.Rptr. 1].) We may not assume or infer in support of the judgment that the court determined the facts as to which findings were requested in favor of defendants. (Code Civ. Proc., §§ 632-634.)

The judgment is reversed with directions to the trial court to conduct such further proceedings as may be necessary to enable the court to make additional findings of fact and conclusions of law and, if required, a revised judgment based thereon.

Jefferson, Acting P. J., and Kingsley, J., concurred.

---

[10]Although plaintiffs were aware prior to the commencement of the action that a Credit Memo had been sent to defendants, they did not anticipate defendants' reliance thereon by pleading their theory of mistake or by seeking judicial rescission or other relief during the pleading stage of the litigation. However, well in advance of the trial both parties submitted pretrial statements in which they separately referred to the Credit Memo and its legal effect. Likewise, interrogatories directed by plaintiffs to defendants were calculated to elicit information as to circumstances attending the Credit Memo's issuance.