[Civ. No. 34330. Second Dist., Div. Five. Jan. 13, 1971.]

JOSEPH A. BALL et al., Plaintiffs and Appellants, v.
AMERICAN TRIAL LAWYERS ASSOCIATION,
Defendant and Respondent.

### COUNSEL

Kaplan, Livingston, Goodwin, Berkowitz & Selvin and Herman F. Selvin for Plaintiffs and Appellants.

Spangenberg, Hasenflue, Shibley & Traci, Craig Spangenberg, James H. Ackerman, Bodle & Fogel, Pollock, Pollock & Fay, Armstrong, Lloyd & Caput, Orville A. Armstrong and Franklin T. Lloyd for Defendant and Respondent.

Robert E. Cartwright, Marvin E. Lewis, Thomas T. Anderson and Leonard Sacks as Amici Curiae on behalf of Defendant and Respondent.

### OPINION

**AISO, J.**—Plaintiffs Joseph A. Ball, Bernard G. Segal, and Edward L. Wright, individually and in behalf of the American College of Trial Lawyers and its members, instituted this action sounding in "unfair competition" against defendant American Trial Lawyers Association[1] seeking to enjoin and restrain defendant from "using in any way the name American Association of Trial Lawyers [*sic*], or any other name confusingly, misleadingly or deceptively similar to the name American College of Trial Lawyers." The trial court, sitting without a jury, rendered judgment in favor of defendant and denied plaintiffs any relief. Plaintiffs appeal from the adverse judgment. We have concluded that the record before us supports the claim for relief and that the judgment should be reversed for the reasons which we shall set forth below.

### I.

The trial court's delineation of the background facts and of the evidence in its "Memorandum Opinion" is fair and full. We, therefore, adopt so much thereof as we deem necessary to an intelligent comprehension of the issues raised on this appeal, with the addition of a few footnotes and insertions or deletions in interests of clarity or brevity.

"The plaintiffs charged and proved that they were and are authorized to bring the instant action on behalf of the plaintiffs, its members and the 'College,' and that the question is and was of common and general interest to the American College of Trial Lawyers.

"Plaintiffs' association limits its membership in any one state to not more than one percent of the lawyers licensed to practice in that state (except by

---

[1]Both the American College of Trial Lawyers and the American Trial Lawyers Association are unincorporated associations. For convenience, we shall refer to the former from time to time as "ACTL" and to the latter as "ATLA" except where the names appear in quotations.

unanimous consent of the board) and further requires that a member has practiced for at least 15 years and has been the chief counsel in at least fifty trials, be actively engaged in trial work, have high ethical standards and personal integrity, good morals and character, general legal learning and superior competency in advocacy, and be nominated by a member (now a member is nominated by a member and seconded by two others) and approved by the 'Board of Regents' of the plaintiffs' association. It was the express purpose of the plaintiffs' association to have a group of outstanding trial lawyers as members of the American College of Trial Lawyers and they sought at all times to make membership a mark of professional distinction. At its beginning in 1950 its scope had been principally as an honorary organization. It has expanded its activities and its interests. Its first expansion of interest was the preparation of a [Code of Trial Conduct] from 1954 to 1956, which was printed and circulated extensively, including republication in the American Bar Association Journal in March of 1957.[2]

"Other than the attention gained from the [Code of Trial Conduct] there was little national publicity for the plaintiffs' association until 1962. Commencing in 1962 the plaintiffs' association commenced seminars and lectures at various law schools throughout the United States, and aided the Moot Court competition throughout the United States. Thereafter it expanded progressively the scope of its work in behalf of the teaching and practice of advocacy both by itself and separately in conjunction with the American Bar Association and American Law Institute. Its membership is 1,802 and seventeen honorary members. Notwithstanding the limited membership, approximately 30 percent of the 250 delegates to the American Bar Association convention are members of the College. The College and its membership are both influential and command prestige.

"In August 1946 a national meeting of state industrial commission officials was held in Portland, Oregon. Some lawyers attended, who practiced chiefly in the workmen's compensation field, and presented the idea of an association interested in the rights of workmen injured in industrial accidents. The name selected was 'National Association of Claimants Compensation Attorneys,' abbreviated to NACCA. In 1948 NACCA admitted some admiralty lawyers, and by 1949 had begun to admit lawyers specializing in FELA and tort cases. In 1948 the association began publishing its own Law

---

[2]The code has also been cited in a number of cases (e.g., *Bernath* v. *Wilson* (1957) 149 Cal.App.2d 831, 835-836 [309 P.2d 87]; *Armstrong* v. *Board of Education* (5th Cir. 1963) 323 F.2d 333, 351; *Whitney* v. *Whitney* (1958) 15 Ill.App.2d 425, 439 [146 N.E.2d 800, 807]; *Ainsworth* v. *Dunham* (1963) 235 Ore. 225, 231 [384 P.2d 214, 217] and reproduced in various periodicals other than the A.B.A. Journal (e.g., 24 Ala. Law. 210 (1963); 35 Fla. B.J. 1073 (1961); 32 J.B.A. Kansas 117 (1963); 11 La. B.J. 137 (1963); 42 Mass. L.Q. 43 (July 1957); 32 Miss. L.J. 65 (1960); 36 N.D. L.Rev. 175 (1960)). (Fn. added.)

Journal, with articles written chiefly by members. Eventually the organization engaged a professional staff to write and edit the Journal. Dean Roscoe Pound was the first full time Editor-in-Chief, and was followed after his retirement by Thomas Lambert, Jr., the former Dean of Stetson Law School.

"During the 1950's the organization's growth came largely from lawyers who practiced in the general tort field rather than in the workmen's compensation specialty. The defendant association commenced to publish a monthly 'newsletter' to members and subscribers,[3] which deals primarily with torts and products liability matters; and in 1965 began publication of a bi-monthly magazine named TRIAL, which now has circulation of approximately 70,000 to members and subscribers and others. The latter magazine is of general interest to the legal profession. Since 1948 the association has conducted seminars relating to trial practice in the tort field; the scope and breadth of said seminars has increased during the past decade and they now, and for a few years past, have related also to other subjects such as the defense of criminal causes. During the year 1966 approximately sixty seminars in forty states were given by or under the auspices of the association on the single subject of 'Damages and Settlements.' Numerous other seminars are given throughout the country, and handbooks in connection with such seminars are ordinarily prepared and distributed to those who register for the seminar. Attendance at the seminars is not limited to members of the defendant association. The defendant association also appears and files *amicus* briefs in matters that it feels are of concern to the association and its members, and appears at or is represented at legislative and administrative hearings on matters which it believes are of concern to trial lawyers, with particular emphasis on such subjects as the attempted curtailment of jury trial, statutory limitations of awards, the Warsaw Convention Air Liability Treaty, and judicial selection.

"The defendant organization was known originally from 1946 to 1960 as the 'National Association of Claimants Compensation Attorneys'; from 1960 to 1964 as 'National Association of Claimants Counsel of America'; and from August 2, 1964 to date as 'American Trial Lawyers Association.' Also, during the period from 1946 to 1964 it was commonly called or referred to as 'NACCA.'

[In connection with defendant's name change in 1964,] "The Board of Governors did not adopt any of the names recommended by its committee appointed for the purpose of selecting a new name, but recommended to the membership that the name 'The American Trial Lawyers Association' be adopted as the new name of the organization. At the annual convention

---

[3]Subscribers do not necessarily have to be members or lawyers. (Fn. added.)

in August of 1964 more than two-thirds of the more than one thousand members present voted in favor of a constitutional amendment adopting the name of 'American Trial Lawyers Association.' At present the organization is known also by the capital letters 'ATL' and sometimes by the letters 'ATLA.'

"Although the constitution prohibits taking into membership those attorneys primarily engaged in the defense of tort cases and requires the members to regularly and generally represent injured persons, no instance of enforcement of this provision has been introduced by any party to the instant action. Its membership in 1964 was 14,223 and in 1967 it was 23,611. Its seminar attendance from 1964 to 1968 was approximately 28,000 paid and 8,000 free. (The latter consisting of law students, first-year practitioners and others.) It sold in excess of 15,000 books relating to or arising from the seminars, in addition to those furnished to the persons attending. The defendant has 36 employees, including not less than six lawyers.

"As its then president expressed it in speaking of the defendant: 'It was for lawyers who either were interested and engaged in matters affecting and involving the litigating process . . . who had a desire . . . to be educated in this area. . . . Amongst our members were literally droves of lawyers who engaged in many areas of trial law other than tort work, particularly in the smaller cities. . . . Our thrust was to try to broaden this scope and develop a Bar that would be more sensitive to the needs of our courts and our judicial system.'

"The name adopted was suggested by Thomas Lambert, the editor of their newsletter, and a discussion did occur as to whether the American College of Trial Lawyers would 'object' and it was decided by the Board that it would not because 'American' occurs in the names of hundreds of organizations, including many legal organizations, and, in conjunction with two common words (Trial Lawyers), was descriptive of the scope of the defendant association; they knew little of the plaintiffs' association, thought it was mostly honorary and social, felt its selectivity consisted in part in the exclusion of lawyers who acted primarily on behalf of plaintiffs. In said connection, some believed the plaintiffs' association substantially excluded lawyers who specialized in the representation of plaintiffs, and claimed at said time that only one of the attorneys who was considered an outstanding plaintiff lawyer out of the thirty thousand lawyers in New York City was a member, although the president of the defendant association believed that at least twenty to thirty qualified.

"Although no instances were shown of anyone joining the defendant association thinking it was the plaintiffs' association, instances were shown (approximately ten in number) wherein younger lawyers (primarily) received

invitations to join the American Trial Lawyers Association and thought they were being invited to join the American College of Trial Lawyers. In addition, various instances were testified to of confusion, arising primarily out of individuals or organizations who sought copies of a pamphlet or publication entitled 'Stop Murder by Motor.' In almost every instance of such confusion, it arose out of the person desiring the pamphlet not having the address of the American Trial Lawyers Association and checking or causing the public library to check in the fourth edition of Gale's *Encyclopedia of Associations,* a reference book purporting to list all nonprofit national associations. Said edition was published in June of 1964, which was immediately prior to the change of name by defendant association. The American College of Trial Lawyers is listed on page 327, and when the American Trial Lawyers Association could not be located in the encyclopedia, inquiries were sometimes directed to the American College of Trial Lawyers (the next or Fifth Edition of the encyclopedia was due to be published in January 1968.) Incidentally, for the Fifth Edition the publisher wrote to the American College of Trial Lawyers at Los Angeles and the American Bar Association at Chicago asking for the headquarter's address of the American Trial Lawyers Association and received a reply only from the American Bar Association giving the correct address. There were other instances of confusion; such as a press report of the 1968 convention of the College coming through on the teletype as a report of the American Trial Lawyers Association, and instances when members or officers, past or present, of one association were credited with being members or officers, past or present, of the other association; and also a few instances when judges mistook membership in or a seminar by or under the auspices of one association as membership in or a seminar on behalf of or under the auspices of the other association.

"The thrust of the College's complaint, as testified to by its current president and others, *in fact,* seems to be that the defendant association publicizes highly its activities, publications and seminars, and by doing so dissipates (dilutes) the value of the name of the plaintiffs' association and there is or may be attributed to the latter activities over which it has no control and with which it has no connection, to wit: the publications, the positions on policy and legislative matters, and seminars of the defendant association.

"Notwithstanding the fact that each drew its membership from the law profession, and their aims ran parallel and for the benefit of the profession and the public in many instances, both their objectives and their policies did not always harmonize. Although the College has broadened in its purposes, it is still listed in the 1968 edition of Gale's *Encyclopedia of Associations* as an: 'Honorary society of practicing trial lawyers, former trial lawyers now holding elective or appointive posts and judges of courts of record.' On the other hand, despite the broadening of its interests, also, the American Trial

Lawyers Association is listed upon the next page of said Encyclopedia as consisting of: 'Attorneys specializing in the representation of injured persons.' Its objectives are presently stated therein as: 'To spread knowledge of current cases and events in workmen's compensation, railroad, admiralty, personal injury (tort) law, and aviation law.'

"Shortly after the action by the Board of NACCA in February of 1964, a copy of the April NACCA News Letter relating to the action was sent to Mr. Whitney North Seymour, the President of the College. He immediately wrote [on April 20, 1964] to the Honorable Emil Gumpert, a founder, Past President and Chancellor of the College. [The first paragraph thereof read:]

" 'One of our members has sent me the enclosed copy of the April NACCA News Letter reflecting a decision to change the name of that Association to "American Trial Lawyers Association." This seems to me to have the germs of confusion with the College and I rather think we should lodge a protest with NACCA which will probably be unavailing. . . .' [It also solicited Judge Gumpert's guidance and advice thereon.]

"On May 7, 1964 Mr. Seymour wrote to Mr. Fuchsberg, the President of NACCA. [The letter read:]

" 'A Fellow of the College has recently sent me a copy of your News Letter of April, 1964 indicating that you are considering changing the name of your organization to "American Trial Lawyers Association."

" 'I hope you will reconsider this plan. The proposed name is so similar to the name of this College, which has been used for many years and has acquired a special meaning in the minds of members of the public, the Bench and Bar, that it could cause serious confusion. If you really feel that you must change your own long established name it should be possible to select one which would not create confusion. I should be glad to discuss the entire matter with you at your convenience.

" 'I am taking the liberty of sending copies of this letter to some of those who are members of both organizations.

" 'Sincerely yours,
Whitney North Seymour
President'

"Mr. Fuchsberg replied on May 18, 1964:

" 'Thank you for your letter of May 7, 1964 on the subject of our proposed change of name to "American Trial Lawyers' Association."

" 'It is the feeling of most of our people that the elements of selectivity

which enter into your choice of membership make the word "College" in your title the significant one.

" 'However, I intend to bring your letter to the attention of the officers and members of the Board of Governors and hope to have the opportunity to discuss it with you thereafter.

" 'Sincerely yours,
Jacob D. Fuchsberg' "

## II.

This suit is not the first in which a "non-profit"[4] organization composed of persons practicing a given profession, in which admission to membership is limited by self-imposed standards of selection, has sought the aid of the equitable conscience of the court to protect its organizational name composed of geographical, generic, or descriptive words which have acquired a secondary meaning. The protectible interest[5] in such instances has been held to be the reputation enjoyed by the organization and the professional status or standing which membership therein confers upon its members.[6] (See, e.g., *Society of Accountants and Auditors* v. *Goodway* (1907) 76 L.J.Ch. (n.s.) 384; *American Institute of C.P.A.* v. *American Inst. of C.P.A.* (D.C. Puerto Rico 1960) 183 F.Supp. 926; cf. *Society of Accountants in Edinburgh* v. *Corp. of Accountants, Ltd.,* 20 Sess. Cas., 4th series, 750 (Scot.2d Div. 1893).) As early as 1907, it was held that under such circumstances relief will be granted without inquiring into the question of fraud. (*Society of Accountants and Auditors* v. *Goodway* (1907) *supra,* 76 L.J.Ch. (n.s.) at p. 389; cf. *Society of War 1812* v. *Society of War 1812 in N. Y.* (1900) 46 App.Div. 568, 573 [62 N.Y.S. 355, 358-359].)

█ We also note in passing that in California a nonprofit organization may maintain a suit for "unfair competition" to protect its tradename.

---

[4]Defendant concedes in its brief that "The College has no commercial taint." Nevertheless, the element of some indirect monetary benefits cannot be ignored entirely. In the determination of what constitutes a reasonable fee for legal services where the value thereof is disputed, one factor considered is the lawyer's standing at the bar. There are also some commercial aspects in the widespread sales and distribution of defendant's publications and popularization of its seminars for which fees are charged, along with its admittedly aggressive publicity policy which must redound at least to the benefit of the counsel winning unprecedented awards of damages for personal injuries.

[5](Cf. *Cape May Yacht Club* v. *Cape May Yacht and C. Club* (1913) 81 N.J.Eq. 454, 457 [86 A. 972, 974]: "[A] court of equity will lend its aid to restrain the unfair use of the name of a corporation formed not for pecuniary profit, to protect its property rights, i.e., the corporate entity, membership, its popularity and influence, and all that goes with them, of which the name is merely the badge."

[6]"There is great honor in being a Fellow of the College." (Respondent's brief, p. 6.)

(*Academy of Motion Picture, etc.* v. *Benson*[7] (1940) 15 Cal.2d 685 [104 P.2d 650]; *Athens Lodge No. 70* v. *Wilson* (1953) 117 Cal.App.2d 322 [255 P.2d 482]; *Most Worshipful Lodge* v. *Sons etc. Lodge* (1949) 94 Cal.App.2d 25, 32 [210 P.2d 34]; *Law* v. *Crist* (1940) 41 Cal.App.2d 862, 865 [107 P.2d 953].)

Defendant contends in its brief that "[t]he real dispute is one of law, centering on the claim by one group of trial lawyers that it can exclusively appropriate and monopolize the common descriptive words 'trial lawyers' and 'American.' " Plaintiffs rejoin, and we think correctly, that no question of *exclusive appropriation or monopolization* of these words, which are a part of our lingual heritage, is involved. The gravamen is in the particular combination or grouping in which they are used, not in the use of the words in their primary or lexicographical sense. ACTL's ownership of the name, "American College of Trial Lawyers," has been admitted by defendant. The question of whether plaintiffs' name has acquired a secondary meaning is really not in dispute. The dispositive issue in this case is: whether the word phrase, "American Trial Lawyers Association," by sight, sound, or meaning is of sufficient similarity that there is a likelihood of its being confused with the preexisting word combination, "American College of Trial Lawyers," by the average member of the public who may come into contact with the reputation of either organization, the activities of either or of its respective members, or the position or views of the respective organizations on contemporary controversial legal problems? If such a likelihood of confusion exists, then injury cognizable in equity has occurred or is sufficiently imminent to justify preventive relief, no matter whether defendant be acting in good faith or how laudable its goals be "according to its lights."[8] The first user is entitled to maintain or improve its reputation or goodwill attached to the secondary meaning of the phrase first used by it. If a newcomer's utilization of a tradename results in a likelihood of confusion by the relevant public, the control of the first user as to its reputation and the professional status incident to membership in it is then lost and passed to the later user who owes no allegiance or loyalty to the first user.

While this case appears to be the first instance in which this particular facet of the "doctrine of unfair competition" is invoked as the basis of relief in a dispute between two nonprofit organizations of the kind here involved, we think it appropriately applicable and that it should therefore be applied. As our Supreme Court stated in *Academy:* "The case before us may be novel, but it does not follow that the plaintiff may not be entitled to some relief." (15 Cal.2d at p. 691.) The tendency of the law, both

---

[7]Hereafter cited as *"Academy"* for convenience.

[8]"[ATLA] is interested in doing good, according to its lights." (Respondent's brief, p. 6.)

legislative and common law, in the area of "unfair competition" has been to impose "increasingly higher standards of fairness or commercial morality in trade" even where the dispute is in the setting of the market place. (See *People* ex rel. *Mosk* v. *National Research Co. of Cal.* (1962) 201 Cal. App.2d 765, 770 [20 Cal.Rptr. 516].) No reason occurs to us why a similar approach should not be taken in a dispute between two organizations composed of attorneys who are in certain respects "officers of the court." The controlling principle applicable is readily ascertainable from a review of the available authoritative materials.

■ It is hornbook law that geographical, generic, or descriptive words may not be exclusively appropriated for the purposes of a tradename, but if the name acquires a secondary meaning, equity will grant protection appropriate to the circumstances. (See, e.g., *Academy* (1940) *supra,* 15 Cal.2d 685, 688-689; *Hair* v. *McGuire* (1961) 188 Cal.App.2d 348, 352-353 [10 Cal.Rptr. 414], and cases there cited.) "The phrase 'secondary meaning,' as thus used . . . means . . . a subsequent significance added to the previous meaning of the designation and becoming in the market place its usual and primary significance. . . . The issue . . . is whether or not in fact a substantial number of present or prospective purchasers understand the designation, when used in connection with goods, services or a business, not in its primary lexicographical sense, but as referring to a particular person or association." (Rest., Torts, § 716, com. b.)

In this case, the trial court found in effect that ACTL's name, "American College of Trial Lawyers," had acquired a secondary meaning. Finding No. 1 in part was: "The American College of Trial Lawyers is a voluntary unincorporated association of 1,802 members and 17 honorary members, composed of lawyers who specialize in and have achieved marked skill and distinction in the trial[9] and appeal of litigated causes. Membership in it is by invitation only . . . and such membership is and is generally considered to be a mark of professional distinction." In Finding No. 4, the court found in part: "the word 'College' has acquired a secondary meaning identifying the American College of Trial Lawyers."[10] Part of Finding No. 21 was: "The reputation of the College at the time the defendant changed its name

[9]It is somewhat ironical that even with this "marked skill and distinction" plaintiffs lost this case in the trial court. Maybe this merely proves the verity of what Judge Frank characterized as the "chanciness" of litigation which cannot be entirely eliminated. (See, Frank, Courts on Trial (1949).) ATLA's chief trial counsel is a member of ACTL as well as ATLA.

[10]As we point out later, confining the "linear dimension" of the word symbols to be compared to the single word, "College," was error. However, if (as the trial court found) this single word identifies the American College of Trial Lawyers, then *a fortiori* the full name would.

was great." We think these express findings and others implied thereby were adequate to get over the secondary meaning hurdle.

■ Although the appellation "unfair competition" is still used to denominate the equitable doctrine and rules operative in this field of disputes over tradenames, direct competition between the parties is not a prerequisite to relief. (See, e.g., *Schwartz* v. *Slenderella Systems of Calif.*[11] (1954) 43 Cal.2d 107, 112 [271 P.2d 857]; *Academy* (1940) *supra,* 15 Cal. 2d 685, 689; *Sunset House Distributing Corp.* v. *Coffee Dan's, Inc.* (1966) 240 Cal.App.2d 748, 753 [50 Cal.Rptr. 49].) Emphasis is now placed upon the word "unfair" rather than on "competition." (*MacSweeney Enterprises* v. *Tarantino* (1951) 106 Cal.App.2d 504, 513 [235 P.2d 266]; *Winfield* v. *Charles* (1946) 77 Cal.App.2d 64, 70 [175 P.2d 69].)

"Unfair competition" has been defined in Civil Code section 3369[12] and this definition has been held to be "not essentially different from that which has historically furnished the basis for equity injunctions against unfair competition." (*International etc. Workers* v. *Landowitz* (1942) 20 Cal.2d 418, 422 [126 P.2d 609].) Since the basis of relief under section 3369 may be "unlawful, unfair or fraudulent business practice" or "unfair, untrue or misleading advertising" (see, e.g., *Slenderella* (1954) *supra,* 43 Cal.2d 107, 111; *MacSweeney Enterprises* v. *Tarantino* (1965) 235 Cal.App.2d 549, 555 [45 Cal.Rptr. 546]; *Family Record Plan, Inc.* v. *Mitchell* (1959) 172 Cal.App.2d 235, 245 [342 P.2d 10]), a finding of fraud is no longer a prerequisite to a grant of relief (*Visser* v. *Macres* (1963) 214 Cal.App.2d 249, 255-256 [29 Cal.Rptr. 367]; *Hair* v. *McGuire* (1961) *supra,* 188 Cal.App. 2d 348, 355; *Stork Restaurant* v. *Sahati* (9th Cir. 1948) 166 F.2d 348, 360).

"The unfair competition action represents an attempt by the courts to protect goodwill and reputation or, as the Supreme Court has characterized, 'celebrity.' It is not an attempt to curb evil intentions. The question is not [so much] the mental state of the defendant, but the effect of defendant's

[11]Hereafter referred to merely as *"Slenderella."*

[12]Civil Code section 3369 provides in part:

"2. Any person performing or proposing to perform an act of unfair competition within this State may be enjoined in any court of competent jurisdiction.

"3. As used in this section, unfair competition shall mean and include unlawful, unfair or fraudulent business practice and unfair, untrue or misleading advertising and any act denounced by Business and Professions Code Sections 17500 to 17535, inclusive.

"4. As used in this section, the term person shall mean and include natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons.

"5. Actions for injunction under this section may be prosecuted by . . . any person acting for the interests of itself, its members or the general public."

acts on plaintiff's business." (2 Nims, Unfair Competition and Trademarks (4th ed. 1947)[13] pp. 1081-1082.) "The damage to the plaintiff's business and goodwill may be as great where the defendant was honestly mistaken as to the extent of his rights and his motives are not questioned as in a case of deliberate fraud and deception." (1 Nims, § 7, p. 42.)

Relief has been granted against acts of the later user productive of deception or confusion without regard to his actual intentions. (*MacSweeney Enterprises* v. *Tarantino* (1951) *supra,* 106 CalApp.2d 504, 513-514.) The basis for such relief has sometimes been characterized as "constructive fraud" (*Visser* v. *Macres* (1963) *supra,* 214 Cal.App.2d 249, 256-257). Similar types of implicit legal characterizations or rationalizations may be drawn from cases where the court has found "commercial hitch-hiking which the law finds offensive" (*Bard-Parker Co.* v. *Crescent Mfg. Co.* (1940) 174 Misc. 356, 360 [20 N.Y.S.2d 759, 762].) " 'Indeed there is a kind of fraud, as courts of equity have long perceived, in clinging to a benefit which is the product of misrepresentation, however innocently made. . . .' " (*Stork Restaurant* v. *Sahati* (9th Cir. 1948) *supra,* 166 F.2d 348, 360; see also *Brooks Bros.* v. *Brooks Clothing of California* (S.D.Cal. 1945) 60 F.Supp. 442, 455-456, affd. (9th Cir. 1947) 158 F.2d 798.)

The likelihood of confusion between the two names has been admitted in defendant's brief. The legal conclusion of the trial court: "28. The name American Trial Lawyers Association is not confusingly similar to the name American College of Trial Lawyers" is both inadequate as a finding of fact and not supported by necessary findings as a conclusion of law. Even though there be no competition between the parties, if the public is likely to identify the goods, services or activities of the second user as coming from or being connected with the first user because of the second user's trade-name, then injury has occurred, by applying the "controlling principle" of "confusion of source" and its corollary "dilution of goodwill" (*Stork Restaurant* v. *Sahati* (9th Cir. 1948) *supra,* 166 F.2d 348, 356). The reputation for quality or the goodwill of the first user is then placed "to some extent in the hands of a [person or entity] who owes [the first user] no allegiance and has no concern in maintaining the high reputation [or goodwill] established by" the first user. (*MacSweeney Enterprises* v. *Tarantino* (1951) *supra,* 106 Cal.App.2d 504, 513; accord: *Slenderella* (1954) *supra,* 43 Cal.2d 107, 112; *Winfield* v. *Charles* (1946) 77 Cal.App.2d 64, 70-71; *Stork Restaurant* v. *Sahati* (9th Cir. 1948) *supra,* 166 F.2d 348, 356; Rest., Torts, § 712, com. g.)

"This is an injury, even though the borrower does not tarnish it, or divert

---

[13]Further references to this edition of Nims' works will be "Nims."

any sales by its uses; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask." (Hand, J., in *Yale Electric Corp.* v. *Robertson* (2d Cir. 1928) 26 F.2d 972, 974.) "And even though the actor's goods may be of high quality, the other is still subjected to commercial detriment, since he can in no way control or assure the maintenance of that quality." (Rest., Torts, § 712, com. g.) It is no defense that the goods or services of the defendant are excellent (*MacSweeney Enterprises* v. *Tarantino* (1965) *supra*, 235 Cal.App.2d 549, 562) or that defendant's reputation is better than that of the plaintiff (3 Callmann, Unfair Competition, Trademarks and Monopolies (3d ed. 1969), § 80.2, p. 549). Nor is the claim that the tradename in question was first used by a third party, not a party to the action, a defense. (*National Van Lines* v. *Dean* (9th Cir. 1956) 237 F.2d 688, 693, overruled on another point, *Maier Brewing Co.* v. *Fleischmann Distilling Corp.* (9th Cir. 1966) 359 F.2d 156.)

Legislative recognition has been given to the teachings of this line of judicial decisions in Business and Professions Code section 14330.[14] It reads in part which is here pertinent: "Likelihood of injury to business reputation or of dilution of the distinctive quality of . . . a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." The general rule in cases involving injunctions is to apply the law in effect when the appellate court renders its decision. (See, e.g., *People* ex rel. *S.F. Bay etc. Com.* v. *Town of Emeryville* (1968) 69 Cal.2d 533, 548, fn. 5 [72 Cal.Rptr. 790, 446 P.2d 790]; *Complete Serv. Bur.* v. *San Diego Med. Soc.* (1954) 43 Cal.2d 201, 207 [272 P.2d 497]; *Tulare Dist.* v. *Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489, 527-528 [45 P.2d 972].) However, Business and Professions Code section 14212 adopted at the same time as section 14330 provides: "This chapter shall not affect any suit, proceeding or appeal pending on the effective date of this chapter." Consequently, the provisions of section 14330 cannot be applied directly to this case. The statute, however, does not purport to be one changing the common law then prevailing in this jurisdiction. In fact, it would appear to be one confirming the common law as we have briefly delineated it above and which we apply to this case.

### III.

▮ Coming more specifically to the evidence and the facts of this case, we find that the findings of fact as made below are not adequate to preclude plaintiffs from preventive relief. While the scope of review in an "unfair

---

[14]Added by Statutes of 1967, chapter 1556, section 2.

competition" case is governed by the normal rules on appeal, including that which precludes reexamination of facts found by the trial court on conflicting evidence, these rules do not preclude the appellate court from ascertaining whether the proper rules were applied in reaching those findings of fact. (*Viking Automatic Sprinkler Co.* v. *Viking Fire Protection Co.* (1968) 280 Minn. 250, 255-256 [159 N.W.2d 250, 254].) Nor do those rules bar the appellate court's inquiry as to whether findings were made on all material issues in the factual dispute, whether more specific findings should have been made in light of requests made (as plaintiffs did herein) under Code of Civil Procedure section 634,[15] whether so-called findings are true findings of fact, or whether findings are supported by the evidence.

As we have pointed out earlier, findings to the effect that defendant acted in good faith, that it did not adopt the name "American Trial Lawyers Association" with any intent to confuse or to obtain the benefit of "the reputation, stature and professional distinction of the College and its members," or that ACTL's "reputation has increased each year since the defendant's change of name without any lessening thereof by reason of the change of name by the defendant" do not bar relief upon the theory on which plaintiffs predicate their case. To sustain a judgment in favor of defendant and to preclude plaintiffs from any relief, the court should have also made findings necessary to arrive at the conclusion that there is also no "unfairness" or "constructive fraud" by operation of law.

Because we must in these cases deal not only with actual fraud, deception, or confusion, but also with law imposed concepts of "unfairness" or "constructive fraud," some of the purported findings of facts in this case are really conclusions of law. ▮ " 'If, from the facts in evidence, the result can be reached by that process of natural reasoning adopted in the investigation of truth, it becomes an ultimate fact, to be found as such. If, on the other hand, resort must be had to artificial processes of the law, in order to reach a final determination, the result is a conclusion of law.' " (*Hayward Lbr. Co.* v. *Construction etc. Corp.* (1952) 110 Cal.App.2d 1, 3 [241 P.2d 1054].) A finding of unfairness or fraud imposed by law without regard to the actual intention of a defendant is one reached by artificial processes of the law based on other subsidiary findings of fact.

---

[15]Code of Civil Procedure section 634: "When written findings and conclusions are required, and the court has not made findings as to all facts necessary to support the judgment or a finding on a material issue of fact is ambiguous or conflicting, and the record shows that such omission, ambiguity or conflict was brought to the attention of the trial court either prior to entry of judgment or in conjunction with a motion under Section 657 [for new trial] or 663 [for vacation of findings and entry of a different judgment], it shall not be inferred on appeal . . . that the trial court found in favor of the prevailing party as to such facts or on such issue."

Whether a finding be in terms of a finding of an ultimate fact or whether it be a mislabeling of a conclusion of law, in face of a request for findings of specific facts under Code of Civil Procedure section 634, a finding may be inadequate. ■ The purpose of section 634 "was to discourage the mere finding of so-called ultimate facts when such method left counsel and the appellate court unable to determine the trial court's resolution of the conflicting facts needed for a factual determination of the case. The purpose of the amendment was to compel the trial judge, when requested, to make findings on specified material issues of fact." (*Garber* v. *City of Los Angeles* (1964) 226 Cal.App.2d 349, 354, 355 [38 Cal.Rptr. 157]; and see *Shepherd* v. *DeVille Engineering Constr. Co.* (1968) 268 Cal.App.2d 596, 605 [74 Cal.Rptr. 174].) A finding on a subsidiary fact probative of the ultimate fact can be material. "The findings of probative facts can be used to overcome an express finding of the ultimate fact found, or [*sic*] where it appears that the trial court made the alleged finding of ultimate fact simply as a conclusion from the particular facts found." (*Robinson* v. *Raquet* (1934) 1 Cal.App.2d 533, 541 [36 P.2d 821].) ■ The findings of fact must be definite and certain so that the defeated party may show how or in what manner the findings made are unsupported by the evidence. (*Andrews* v. *Cunningham* (1951) 105 Cal.App.2d 525, 528-529 [233 P.2d 563]; *Carrey* v. *Boyes Hot Springs Resort, Inc.* (1966) 245 Cal.App.2d 618, 620 [54 Cal.Rptr. 199] (dictum).)

a. *The tradename or symbol in question.*

■ We think the trial court erred as a matter or law in finding that the distinctive feature in ACTL's name, "American College of Trial Lawyers," is the word, "College." A phrase may be the basis of identification by the public. (1 Nims, § 39, pp. 163-164.) "Similarity of appearance is determined on the basis of the total effect of the designation, rather than on comparison of individual features. While individual features may be dissimilar, the total effect may be one of similarity." (Rest., Torts, § 729, com. b.) It is the impression which the tradename as a whole creates on the average reasonably prudent member of the relevant public and not the parts thereof which is important. (*American Auto. Assn.* v. *American Auto. Owners Assn.* (1932) 216 Cal. 125, 132 [13 P.2d 707, 83 A.L.R. 699]; *Sunset House Distributing Corp.* v. *Coffee Dan's Inc.* (1966) *supra,* 240 Cal.App.2d 748, 756; *Metro-Goldwyn-Mayer, Inc.* v. *Lee* (1963) 212 Cal.App.2d 23, 28 [27 Cal.Rptr. 833]; *H. Moffat Co.* v. *Koftinow* (1951) 104 Cal.App.2d 560, 565 [232 P.2d 15].) The entire phrase names, "American College of Trial Lawyers" and "American Trial Lawyers Association," should have been the units of comparison in determining distinctiveness or the likelihood of confusion or similarity in face of objection to proposed finding No. 5 (find-

ing No. 4) and a request for special findings, inter alia, that "The value, distinctiveness and secondary meaning of the name 'American College of Trial Lawyers' inhere in the combination of words making up and used in that name." If this be a question of fact, then there was a failure to find upon a material issue necessitating a reversal of the judgment. We do not, however, restrict the basis of our decision to this issue only.

### b. *The relevant public.*

■ In deciding the question of likelihood of confusion, the preliminary determination of what constitutes the relevant public is a material issue. We think the trial court committed legal error in confining the relevant public to "the bench, members of the bar, law teachers, law students, and (perhaps) public officials." This segment of the relevant public was sufficiently substantial for the purposes of ascertaining whether the tradename had acquired a secondary meaning. However, on the broader question of likelihood of confusion, we feel that the relevant public includes that cross-section of the populace who may come into contact with the names or the respective reputations of either organization, the activities of either organization or of its respective members, or the official positions or views of either organization upon contemporary controversial legal problems. These matters are not confined to the discerning few, such as the bench, bar, law professors, and public officials. The cases that confine the possibility of confusion to a small sophisticated circle are therefore distinguishable and inapplicable. The situation is somewhat analogous to where wholesale purchasers or factors may not be misled, but that the ultimate consumer may be.[16] The inner core of the relevant public consisting of judges, lawyers, law professors, and "(perhaps) public officials" may not be misled or confused, but if those on the outer fringes of the relevant public are susceptible of being confused, preventive relief should not be denied.

### c. *Likelihood of confusion.*

■ The likelihood of confusion between tradenames is ordinarily a question of fact. (*Visser* v. *Macres* (1963) *supra,* 214 Cal.App.2d 249, 254; *Hair* v. *McGuire* (1961) *supra,* 188 Cal.App.2d 348, 354; *Beverly Hills Hotel* v. *Hilton Hotels* (1955) 134 Cal.App.2d 345, 349 [285 P.2d 1012].) In some instances, however, just the comparison of the two names themselves

---

[16]Cf. "The prospective purchasers likely to be misled may be any purchasers, whether initial, intermediate or ultimate in the chain of marketing. It is immaterial that the initial purchasers are not misled if the remote purchasers are likely to be. The person adopting the designation and the person having the trademark or trade name are interested not merely in the immediate purchases from them, but in the purchases of their goods all along the chain of marketing." (Rest., Torts, § 728, com. d.)

may be adequate to establish the likelihood of confusion. (*Academy* (1940) *supra,* 15 Cal.2d 685, 691; *Hair* v. *McGuire, supra;* Rest., Torts, § 728, com. a.) "The Hollywood Motion Picture Academy" was held to be a name which was prima facie confusing with "The Academy" or "The Motion Picture Academy" by which plaintiff's organization had come to be known. (*Academy* (1940) *supra,* 15 Cal.2d 685, 691.) The name, "Columbia Educational Institute" has been held to be confusingly similar as a matter of law with "Columbia University." (*Trustees of Columbia University* v. *Axenfeld* (1930) 136 Misc. 831 [241 N.Y.S. 4].)

The two names, "American College of Trial Lawyers" and "American Trial Lawyers Association," approximate similarity as a matter of law when we apply the appropriate cross-section of the populace as the relevant public. However, we are spared from the need of making that determination in this case because defendant has acknowledged the likelihood of confusion. It acknowledges the verity of plaintiffs' statements in argument "that there is 'great publicity sought and attained for [ATLA's] name, thus making it at least subconsciously known to and remembered by many people,' . . . [and] then when the name of the American College of Trial Lawyers at some later time 'comes within the ken of one who has been exposed to that publicity, he is very likely to associate the name with the organization of which he had earlier heard or read [to wit, ATLA].' "

The appropriate individual on the confusion issue is the member of the relevant public who is the average prudent man. That a few particularly discerning members might be misled is not enough. On the other hand, it is enough that an appreciable number of the members of the relevant public are likely to be misled or confused, even though by exercising greater discernment they could avoid the error. (Cf. Rest., Torts, § 728, com. a.) "Purchasers commonly assume that a designation substantially similar to a person's trade-mark or trade name will not be used by another for similar goods." (Rest., Torts, § 728, com. c.)

The law is that "[a]lthough factual instances of confusion may support a determination that confusion of the public is likely from the use of identical or similar trade names, they do not compel that conclusion as a matter of law." (*Slenderella* (1954) *supra,* 43 Cal.2d 107, 113; accord: *Beverly Hills Hotel* v. *Hilton Hotels* (1955) *supra,* 134 Cal.App.2d 345, 349.) Nevertheless, as set forth in the trial court's findings and its summary of the evidence adopted as our summary, there were actual instances of confusion even among members of the bar, the bench, and others closely related to the legal profession. In a close case, the second user's knowledge of the first user's use of his particular trade-name and the second user's intention in adopting the particular name of

his selection "is an important factor in determining whether or not his designation is confusingly similar." (Rest., Torts, § 729, com. f.) One of the main reasons for defendant's change of name was the desire to eliminate the " 'gimme' connotation of the word 'claimants' " in their former title "National Association of Claimants Counsel of America" (NACCA). It is inferable that this objective played a part in the selection of the new name; in any event this factor should not be ignored entirely.

It is settled law that proof of actual deception or of confusion is not required; protection is afforded against just the probability or likelihood of deception or confusion. (*Academy* (1940) *supra,* 15 Cal.2d 685, 691-692; *Metro-Goldwyn-Mayer, Inc.* v. *Lee* (1963) *supra,* 212 Cal.App.2d 23, 29; *Hair* v. *McGuire* (1961) *supra,* 188 Cal.App.2d 348, 353; *Hesse* v. *Grossman* (1957) 152 Cal.App.2d 536, 541 [313 P.2d 625]; *MacSweeney Enterprises* v. *Tarantino* (1951) *supra,* 106 Cal.App.2d 504, 512; *Winfield* v. *Charles* (1946) *supra,* 77 Cal.App.2d 64, 70.) " 'One does not have to await the consummation of threatened injury to obtain preventive relief.' " (*Standard Oil Co. of New Mexico* v. *Standard Oil Co. of Cal.* (10th Cir. 1932) 56 F.2d 973, 976.)

d. *Failure to make findings relative to law imposed unfairness or constructive fraud, or the lack thereof.*

Before a court may conclude that there is no unfairness or constructive fraud which the law imposes without regard to the actual intent of the later-comer, certain other rules or considerations should be passed upon by the trial court and appropriate findings made thereon.

The court did make a finding on whether defendant was aware of the existence of plaintiff's tradename. (Rest., Torts, § 729, com. f.) The pleadings further put in issue whether defendant adopted the name, "American Trial Lawyers Association," over the objections of ACTL that the name was confusingly similar. A finding thereon should have been made. It is material to the issue of laches raised by defendant and to the consideration of the costs which might be involved if preventive relief forces defendant to change its name. Material, too, is a finding that a discussion among defendant's membership did take place, as to whether ACTL would object and whether the proposed name "American Trial Lawyers Association" would not be confusingly similar to "American College of Trial Lawyers."

The court should also consider and make a finding on whether it was commercially feasible for the defendant to have chosen some other name and yet achieve the ends sought in its name change. (*Eastern Columbia, Inc.* v. *Waldman* (1947) 30 Cal.2d 268, 270 [181 P.2d 865]; *Industrial Photo Service* v. *Kelly* (1961) 198 Cal.App.2d 665, 668-669 [17 Cal.

Rptr. 907]; *Marsalli's Coffee* v. *Blue Ribbon Prod. Co.* (1958) 159 Cal. App.2d 357, 364 [323 P.2d 787]; *Stork Restaurant* v. *Sahati* (9th Cir. 1948) *supra,* 166 F.2d 348, 364; *Akron-Overland Tire Co.* v. *Willys-Overland Co.* (3d Cir. 1921) 273 F. 674, 676-677; 1 Nims, § 57, p. 183; 2 Nims, § 366g, p. 1153.) Were there other combinations or names of equal utility to the defendants? There is another organization closer in purpose to that of ACTL than ATLA, yet that organization saw fit to adopt the name "The American Board of Trial Advocates." In this regard, plaintiffs did request a special finding that: "At the time defendant was considering a proposal to change its name from National Association of Claimants Counsel of America, a committee of its members was appointed to consider and recommend a new name to defendant's governing board. Said committee did consider and recommend to said board a number of suitable new names, none of which, however, was 'American Trial Lawyers Association.' "

The court should also have given consideration as to whether the name or combination of words which defendant selected, truthfully described the nature of its organization and its membership vis-à-vis the relevant public. (Cf. *Academy* (1940) *supra,* 15 Cal.2d 685, 691; *MacSweeney Enterprises* v. *Tarantino* (1965) *supra,* 235 Cal.App. 2d 549, 562; Civ. Code, § 3369, subds. 2 and 5; 1 Nims, § 7, p. 42.) The words, "Trial Lawyers," in the name, "American Trial Lawyers Association," connote lawyers engaging in trial in all fields of the law and without limitation as to whether they represent plaintiffs or defendants. By their answer, defendants admitted the tort-oriented purposes of their organization and the constitutional bar to membership of any attorney who "for the most part, represents the defense of personal injury litigation."[17] The request for special findings relevant to this issue should

---

[17]Among the purposes of defendant's organization provided in article I of its Constitution are: "especially to advance the cause of those who are damaged in person or property and who must seek redress therefor at law; to resist the constant efforts unduly to curtail the rights of such persons; and to help injured persons especially in the fields of workmen's compensation, railroad, admiralty and tort law; . . . to be a clearing house for all lawyers who are trying to help injured persons; and to encourage the teaching of workmen's compensation, railroad, admiralty and tort law by establishing lectureships throughout the country; . . ."

The answer also stated the requirements for membership in defendant association were set out in article II of its Constitution: "Any person who is duly licensed to practice law in any country, state or jurisdiction and is of good moral character, shall be eligible for or continue his membership in this Association, provided that he or she regularly and generally represents injured persons, and whose practice is consistent with the purposes of this association; provided, however, that no person shall be eligible for or continue his membership in this Association who, for the most part, represents the defense of personal injury litigation." It also alleged: "At all times herein concerned it has been, and still is, the practice of the association to make such

have been granted.[18] Support is also found for the request in that Findings Nos. 7, 8, and 9 are really findings or recitals of evidentiary matters.

### e. *Findings not supported by evidence.*

So much of Finding No. 22 as reads: "No person invited to join the College has refused to join by reason of the defendant's change of name" is not supported by the evidence, which showed that Judge Rosenman, then President of the Association of the Bar of the City of New York, did first decline the invitation of then President of ACTL, Whitney North Seymour, to join ACTL, because of a misattribution of some of the activities of ATLA to ACTL.[19]

So much of Finding No. 25 reading: "The allegations in paragraph X of the Complaint were not proved" as refers to plaintiffs' allegation in paragraph X that because of defendant's acts the result will be "that the reputation of the American College of Trial Lawyers is and will continue to be affected and formed by the activities and reputation of defendant over which and whom the American College of Trial Lawyers has no control" is likewise without support in the evidence for the reasons we have heretofore discussed at length.

### IV.

In view of the disposition we make of this appeal, the motion by plaintiffs that this court take additional evidence under Code of Civil Procedure section 956a is denied. The record reflects that the case was exhaustively tried below. Therefore, in our opinion a trial de novo is not necessary. The judgment is reversed with directions to the trial court: to vacate its findings of fact and conclusions of law and its judgment entered thereon;

---

investigation of a candidate for membership as is necessary to make certain that he fulfills the membership requirements as set forth in the above quoted provision of the Constitution."

[18]Such findings also would have been relevant on the question of the control of ACTL's reputation. We are not concerned with the merits of the purposes of the two organizations, but only with their differences. It was shown that the two organizations do or may take opposing official positions on controversial legal problems, such as "fair trial and free press," curtailment of jury trials in civil cases, limitation of contingent fees by statute or court rule, statutory limitations on awards for personal injuries, the Warsaw Convention Air Liability Treaty, and publicity and exchange of information on the size of jury verdicts and judgments on personal injury claims. Nothing in this opinion should be construed as our indorsing or deprecating either side's views on these issues.

[19]Hearsay objection to the evidence was expressly waived. (Reporter's transcript, p. 406; see also references given in Appellants' opening brief, p. 62, fn. 41.)

to permit, in its discretion, either side to introduce any additional evidence if so requested; and to thereafter make new findings of fact and conclusions of law in conformity with the views in this opinion set forth, and enter judgment thereon.

Stephens, Acting P. J., and Reppy, J., concurred.

A petition for a rehearing was denied February 10, 1971, and the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied March 9, 1971.